Case number 23-3382 from the District of Southern Iowa, Travis Dantzler v. Tonia Baldwin Mr. Adamson, when you're prepared, please proceed.  May it please the Court? Good morning, Your Honors. Will Adamson for the State. Dr. Baldwin is entitled to qualified immunity for two reasons. First, because her treatment of the plaintiff's knee was within the standard of care. Second, because the plaintiff has failed to point to any case that clearly establishes that her conduct violated the Eighth Amendment. I want to start with that second reason first, clearly established law. The only Eighth Circuit published case that the plaintiff can point to is Field v. Gander, a decision from 1984. But that case is not on point for five reasons. First, it wasn't a qualified immunity case. There's no discussion of qualified immunity. There's no discussion of clearly established law or the contours of what is clearly established. Second, it involved the decision of a non-physician. It was a sheriff who denied dental care to an inmate with an infected tooth. Here, though, we have Dr. Baldwin making a medical decision about what she thought was the appropriate course of care for the plaintiff's knee injury. If the medical care provider makes the decision for the same economic reasons that the sheriff would, wouldn't they still be on notice because aren't the issues the same? No, Your Honor. I would say that the clearly established rule that I think the plaintiff draws from the Gander case is that there's some per se rule that any time a non-medical factor might come into the decision making, that that is somehow per se deliberate. Well, no, I think what they're really saying is that when you have a non-medical factor that is based on cost savings to the incarcerating authority, that the rule is the same, right? And so if, in fact, the medical decision is made based on you might be paroled in six months, that that is, on its face, not a medical decision but an economic decision. Certainly, Your Honor. So I would say that that is not clearly established and that would not be deliberate indifference. Why wouldn't it be clearly established when we have several cases to that effect? I guess you're saying since it's not been applied to a physician, is that what you're referring to? But the principle that Judge Erickson just described I think is fairly clear in our precedent. I would respectfully disagree, Your Honor. I was about to cite the case Hancock v. Arnault. That's 39F4-482. And in that case, it involves an inmate's hernia surgery. And the inmate had argued that it was deliberate indifference because there was some prison policy regarding cost making inmates prepay for surgery. And this court held that when there is evidence that the care provided was adequate, an inmate cannot create a fact dispute by pointing to a non-medical factor that could have driven the decision. I think that another case that further supports that... What was the citation for that? Is that in your brief and I just missed it? Your Honor, I don't know if it's specifically in the brief. It's in the district court's opinion, although the district court didn't talk about that. That's 39F4-482 at 488. Thank you. It also seems to me that we might have, if my fellow members of the bench are correct, we might have conflicting clearly established rules here. If you have a situation in which a non-medical factor plays a role, perhaps that's clearly established, although I know you disagree. But we also have, and I think it was in the Leonard case that I wrote for the panel, where we said, well, actually, if alternative care is provided, then it's okay. It's not criminal recklessness, even if the inmate would have preferred some other care. So what do we do when we have those conflicting lines of case law? Well, I think that a circuit precedent is clear that the law isn't clearly established and the court can just decide this case on that narrow ground. And that actually brings me to my third reason why the Fields case is not on point here, is that Fields involved a complete refusal of care. Here you have a physician that provided a course of care. And so it's very important, on the record below, the only testimony from a medical doctor regarding the standard of care is Dr. Baldwin's affidavit, that she believed, based on her evaluations and her medical tests and examinations of the plaintiff, that his knee injury was not serious and that her course of care was entirely appropriate. And that's really important because you could imagine a case where a physician says, hey, we've got this really great new drug, and it would really help you, but it's a million dollars. And that's maybe a little bit beyond the standard of care, that conservative care could be appropriate. And so you have a physician saying, hey, I think we should try this expensive drug. You know what? It's too expensive. We're going to provide you care that's within the standard of care. And then all that has to be followed within the Eighth Amendment, which requires only minimally competent care. So the other side is going to argue, of course, that there's deliberate indifference, deliberate indifference. They'll pound the table. What you're saying is that, look, the standard of care is broader than that, and there were choices, and the choices could be made. And whatever it is, when the physician testifies in an unrebutted way that I had different options, the option I elected was a more conservative, non-surgical option, that what we have sitting there is just a mere negligence or malpractice case. But whatever it is, it doesn't rise to the constitutional violation. And whatever it is, it's not clearly established. Exactly, Your Honor. And I think if you look at the district court's analysis, the district court, it got the first-level principle right, which is that you can infer deliberate indifference when a physician's decision-making is so far outside the standard of care that you just assume that it's deliberate indifference. But the important thing is you have to compare the care to the standard of care. The district court just said, oh, well, there was a non-medical factor, therefore deliberate indifference. But in order to test whether that inference is appropriate, you need to have evidence about what the standard of care here is. And the evidence for standard of care is undisputed in this case. I think that there's an 11th Circuit opinion called Hoffer, H-O-F-F-E-R, 973 F. 3rd, 1263. Suppose we had a different case. And you should finish Judge Erickson's answer in a second. But suppose you had a different case where the doctor looks and says, guy, that knee looks awful. I mean, that is truly awful. It's as big as a watermelon. And boy, if it was anyone else, I would have gotten an MRI. But since you're leaving in six months, well, you can just deal with it when you get parole. Would that be a different case in this case? So it would be different in the sense that those facts are very different than this case. And I think even under the plaintiff-friendly version of the facts, there are no medical examinations that support the plaintiff's knee being the size of a watermelon. In fact, the UIHC physician that examined his knee right before the MRI found no meniscal tear. I think that would be a closer question. I think that the law would not be clearly established on that. I would agree with you, Your Honor, that that looks a little bit more like the Field's case. The Field's case was the sheriff says, hey, you got this infected tooth. It really, really hurts you bad. I know. But you got to pay up first. And using the denial of care just totally deliberately differed to the pain. I think that that might look closer. But I don't think that that would be deliberately different. On the point of considering cost. It doesn't make any difference if the sheriff was silent as opposed to in Fields where he did say that we need someone to bear the cost, which made it plain to everybody in the world that we're making an economic decision, not a medical care decision. Sure. But what if the sheriff just says, dang, looks like that would hurt. Looks like your sentence is up in three days, and then walks away. Is it a different case than Field's? My first answer is that's a little bit like apples and oranges because you have a physician, and you can kind of test the physician's decision making against the standard of care to know, is this doctor making a medical decision or is it just shaking someone down for money? I would say in the case with the sheriff that that may raise an inference of deliberate indifference. But I think I would want to know more about the case law for non-medical personnel, and I'm just not prepared to talk about that. How does the subsequent determination once an MRI is done of the actual condition of the knee and the need for surgery play into the factual disputes about the appellant or the appellee's seeking care? Because one could look at this and say the appellee's complaints were not given appropriate concern. Once the MRI is actually done that he requested, severe condition in the knee is discovered. Surgery is determined to be necessary and provided. How does that play out in terms of the creation of a fact dispute, which is where we are? If this is a fact dispute that needs to be resolved, then we don't have jurisdiction to reverse the denial of summary judgment for qualified immunity. So I understand Your Honor's question to be specifically talking about post-MRI care. I want to make sure I'm answering your question. Is that correct? Yes. So Dr. Baldwin was not the treating physician for the plaintiff after September 16th, and he received the MRI on November 5th, and so that would not be a fact dispute, even if it is a fact dispute that's material to this case. But what I'm saying, there's a fact dispute about the seriousness with which his condition was being treated during the treatment under Dr. Baldwin. The plaintiff's position is, I continually stated how severe my pain was, and in fact specifically requested an MRI. And eventually the medical evidence seems to support that that was the case. Later, after the surgery or as the surgery is done, it's determined, if this had been done sooner, you might not need a knee replacement in a few years, but you likely will now. So specifically addressing your last point, Your Honor, there is specifically a footnote in the district court's opinion that talks about maybe needing a knee replacement because of delay. There's no medical testimony specifically crediting that allegation of the plaintiff. Well, I'm not saying it's true or false. We're not trying to decide the facts. We're trying to determine if there are facts that need to be decided. And if that's the case, it's really for the district court. Yes, Your Honor. And my point about the footnote and the district court also pointed out that the plaintiff did not have a medical expert is merely to point out that that is actually not a fact dispute that's material here because the district court did not find a genuine dispute of material fact regarding whether the treatment was within the standard of care or not. So even if this court might have questions about whether the care was appropriate, the only facts on the record below are that Dr. Baldwin's affidavit states that it was well within the standard of care. So you're saying the dispute of fact about the rationale, the non-medical rationale, is a red herring in this case? Exactly, Your Honor. Dr. Baldwin was unequivocal that her decision was not just based on the backup of MRIs but also on her medical judgment. With that, I see I'm into my rebuttal time, and so I'll save my time for rebuttal. Thank you. Thank you, Ms. Jamison. Ms. Donalds? Please proceed. Good morning, Your Honors. I think I'll start where the state started, and that's whether the right to not have your medical care as an inmate delayed for non-medical reasons is clearly established. And the answer is that clearly it was. I was a little bit surprised to hear that I only cited one published Eighth Circuit case because I don't believe that's the case. That's also not what Judge Evinger's well-reasoned opinion indicates. Fields v. Gander establishes that medical treatment cannot be delayed for non-medical reasons. Dad v. Anoka, by this Court, establishes that medical treatment cannot be delayed for non-medical reasons. Those are the Eighth Circuit cases, but this isn't a novel rule that the Eighth Circuit has come up with. You heard me ask Opposing Counsel, that could be a clearly established principle. We'll have to decide that. But there's a competing principle here. Most of those cases involved really almost no care. I mean, here you did have care. It's sort of undisputed, I think. It wasn't the care he wanted, but he got ibuprofen. He got, I think, a knee brace or a knee wrap or something like that. And so it brings up a slightly different situation, and this would have to be the point that's clearly established, which is if you delay care, perhaps for a non-medical reason, but provide other medical care, right? And so in that big funnel, you decide that I'm going to wait on the MRI. Is that clearly established when you don't get the MRI? I mean, that's sort of because we do have those competing principles at play here, which is some care, not the care he wanted, but some non-medical reasons filtering it. Yes, Your Honor, and that takes us to another case that Mr. Dantzler relied on in his appeal brief and that Judge Ebinger relied on in the district court, Langford v. Norris, also out of the Eighth Circuit. A total deprivation of care is not a necessary condition for finding a constitutional violation. Grossly incompetent or inadequate care can also constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment. And is that question raised factually in this case? Because the argument that the State is making is that, well, you didn't bring a doctor in to say what was the standard of care, and that without raising that, there is no question of fact because, you know, it's kind of like going to a high school debate where, you know, they say 10 billion things and you only manage to say 9,999,999 in return. And they say, oh, they conceded this point because they never mentioned it. I mean, but the question is, is this a factual issue in this case? Absolutely it is. I think there's factual issues with Dr. Baldwin's affidavit. There's factual issues with the medical record. Mr. Dantzler submitted a sworn declaration in a summary judgment resistance that raised some factual disputes with how Dr. Baldwin described her affidavit. But even internally within her affidavit, Dr. Baldwin testifies that a knee injury treated conservatively might take four months to heal. Taking the facts most favorably to Dr. Baldwin, this knee injury occurred in late February of 2021. In April of 2021, she said, you need an MRI. Let's wait and see if you get paroled in October. So two months post-injury, she recognized the need for an MRI. And Dr. Baldwin said, let's add an extra six months, six months before we get you diagnostic care. And the medical record does not include all of these considerations that Dr. Baldwin's affidavit claims that she took into account. She says that it takes so long to get an MRI appointment because of the COVID-19 pandemic. But in September, when she referred him for an MRI appointment, she was able to include on the referral line urgency of appointment two months. And in fact, the record establishes he was seen in two weeks. So that's a fact issue that affects the standard of care in this case. Is that because the condition got worse, though? I mean, this is the problem with second guessing, especially on a criminal recklessness standard, is if it gets worse, it could have been July or August or September. And she says, oh, now we really need to quit. But had it been earlier, she might have said, we could do this in the ordinary course because it doesn't look that bad. So six months, I can't, in good faith, require a stat on this, which is, I guess, the medical term for really hurry up. So it's tough in the criminal recklessness realm. That is the fact issue for the jury to resolve. Is Dr. Baldwin's affidavit stating these are the things that she considered credible when it's compared to the medical record that says, we'll schedule an MRI if you get paroled? It's conditional on the parole, not conditional on his symptoms getting worse. If he doesn't get paroled, they schedule it? Yes. I misspoke. Thank you for correcting that. But if she had put in that medical record, we'll schedule an MRI if your symptoms persist. Or we'll schedule an MRI if our conservative treatment isn't working. Then we have the exercise of medical judgment. And then we get into all of these other cases where medical judgment was exercised. And maybe there is, in fact, monetary consideration in there. Of course there is. It's a prison. They can't give every inmate the five-star treatment that they might want. Of course there can be financial considerations. But if it's only a financial consideration and no medical judgment, that's where deliberate indifference can come in. And you think the record shows, at least from your side, I'm discounting the state's evidence, that the only consideration she had was financial. That none of this about how bad the knee was played into the decision. Mr. Dantzler's declaration was that she took a look at his knee and said, No way is it still swelling you like this. I think you need an MRI. She then goes to his chart and sees that Dr. Baldwin sees that he's scheduled to be reviewed for parole in October. And puts in the medical notes and tells Mr. Dantzler, Okay, if you're still here in October, we'll get that MRI done, right? Mr. Dantzler's sworn declaration is that he asked, Why do I have to wait if I'm in pain now? And she didn't answer him. So from Mr. Dantzler's testimony, which we have to accept at this stage in the case, Yes, there is no evidence that it's based on anything other than the financial incentive of not sending him for an expensive procedure when there's more efficacious, timely treatment available that would solve his problem. What about the verifying medical evidence requirement, which is the burden on the plaintiff to show that the delay actually caused things to be worse. That you can't just say, Well, I was in pain for two or three months. You actually have to show that it had a detrimental impact on his long-term health, which gets at the knee replacement. I'm not sure how much, I don't know if that's a theory. I don't know how much evidence there is to support that. So the Dad-Vianoka case, which came out of the circuit in 2016, talks about the verifying medical evidence issue when there's a delay in the provision of treatment that was ultimately provided. And in that case, this court said that the delay of just two days in that case didn't matter. Mr. Dad, prior to his arrest, had underwent dental surgery and was prescribed Vicodin, and was released on pretrial release two days later. During those two days, he did not have access to Vicodin or any other pain medication. I don't think there's any doubt that not having Vicodin or pain medication made his recovery from surgery take longer, or that he didn't heal normally. But in Dad-Vianoka, what this court said was actionable in the delayed treatment case was the unnecessary pain. But see, the difference is, of course, in this case, he did have pain medication. He had ibuprofen, which may, yeah, is my understanding. What about the other knee, right? I mean, isn't this like the Dizzy Dean hit-in-the-toe case where he destroys his arm, you know? I know you guys followed baseball in the 1930s, probably not. But in any event, what happens is he's got this bad knee. He limps around on his good knee for months and months and months. He then destroys his good knee. And there's evidence of that in the record. Isn't that evidence of some harm that arose out of this conservative treatment theory? That's what Judge Ebinger found in her decision at the district court as well, is that he presented this evidence of injury to his left knee and also just his ongoing knee pain, that it wasn't healing, that there was well-documented evidence that his right knee was not getting better. So, yes, Judge Ebinger did find that those were related problems. And that came from medical expert testimony, all of that, that his other knee ended up getting harmed? Because, again, it requires verifying medical evidence. I don't believe verifying medical evidence is limited to expert testimony. Well, at least medical evidence. Like, I don't know that somebody could claim, oh, my left knee started hurting because I was limping around on it. I think you'd need somebody to say, no, that actually got worse because you were limping around on it. I don't know that you could use common sense or lay testimony for that. Dantzler stated in his sworn declaration that the orthopedic, I believe it was the orthopedic surgeon, but it could have been the doctor at ISP. I did not represent Mr. Dantzler before the district court, so I apologize if I'm mistaken. Testified that he was told that the damage to his right knee would cause him more long-term problems, including needing a knee replacement. And he also, when he was transferred to ISP, attributed to the doctor his left knee problems to limping around on his right leg. Was that Dr. Newton? Yes. Yes, and Dr. Newton put in the treatment notes that the cause was compensating from his right leg as he started getting left knee pain. Judge Erickson, I believe you asked whether the MRI, or perhaps it was Judge Smith, I apologize, asked whether the MRI that ultimately happened in November was relevant to the factual dispute in this case. And it is relevant. It shows that there is a factual dispute, that he was right. It corroborates that he had a serious injury back in April when Dr. Baldwin said, there's no way your knee is falling like this, I think you need an MRI. And it corroborates that the diagnosis of bursitis was wrong. And it corroborates that he needed treatment, specifically surgery, to repair his torn meniscus, which is documented in the record once he has that MRI. Judge Strass, you asked, suppose we had a different case where the knee was swollen to the size of a watermelon and the doctor said, well, you're about to be paroled, so let's just see what happens. Under Mr. Dantzler's version of the case, that is essentially the case that we do have. It wasn't swollen to the size of a watermelon, but it was still swollen. He was experiencing severe pain, which he reported to the treating doctor. I get that, but you also have evidence they looked at it and they didn't think that there was, I guess, any ligament damage. So, of course, an MRI only really treats soft tissue damage. I mean, it can detect fractures, but it's really for soft tissue damage. So if the doctor didn't think there was ligament damage, then perhaps an MRI was more precautionary than necessary. I mean, that is going the other way. Perhaps, Judge, but she said we should get an MRI. I think you do need an MRI. So she recognized that it was necessary, that it was the next step in advancing his care. But the delay wasn't based on is it the most efficacious step for advancing his care or is it reasonable medical judgment for advancing his care? The delay was based on you're about to be paroled. Let's see if you can get this on the outside. The defendants cited a few cases that they claim stand for the proposition that this right is not clearly established, and I think they're worth distinguishing. Leonard v. St. Charles County Police Department was an Eighth Circuit case in 2023 where the plaintiff, Leonard, was not provided his medicine and during a psychotic episode, after being pepper sprayed, pulled his own eye out. I think the factual distinction in that case is fairly obvious, that the plaintiff was an ongoing threat and it was not possible to safely treat him. So the decision to delay was both an exercise of medical judgment that we could manage the situation more safely on suicide watch and still provide the treatment that is suicide watch, in addition to the non-medical situation, which was to protect themselves because nurses aren't required to put themselves in harm's way to treat their patients. East v. Buckner was an unpublished Eighth Circuit case relied on by the defendants. That's also distinguishable in that case. The plaintiff, East, claimed that they needed specialized footwear for their narrow feet, but they weren't diagnosed with any condition other than narrow feet, which some people are lucky enough to have, I guess, that showed that their inability to purchase their preferred shoes was causing them pain or somehow making their situation worse. So that case, there was a medical judgment. She was authorized to purchase a certain kind of footwear. It just wasn't available to her. So that case does not tell us anything about Dr. Baldwin's entitlement to qualified immunity. You know, just to go back to Judge Strass' question about the MRI and the no ligament damage, which is consistent kind of with where they start off from the physical examination of the knee, but, you know, there's all kinds of meniscus. I guess they're menisci because there's two of them in your knee that can cause morbidity in that knee joint, which causes deterioration of the knee to such a point where replacement is necessary. You can talk to any guy that played football in the 1960s, you know, and they are all suffering from that. And none of that's, you can't tell that by mere manipulation of the knee until the time where the little torn piece of cartilage sticks between the kneecap, the patella, I guess, and the rest of the knee and your knee no longer moves. But right up until that time, all you've got is pain, right? I mean, there's just more here than just I looked at the knee and I can, from the outside, just, you know, I know we need an MRI, but not yet. Judge, I see my time has expired. I'll try to briefly answer your question. You state that it's difficult to diagnose a meniscal tear with a physical examination. And I think the record makes that clear. It was difficult because it was a misdiagnosis. That's why we have tools like MRIs available to us. And Dr. Baldwin recognized the need for an MRI. So there's a fact question about whether or not she met the standard of care. There's a fact question about the justification for the delayed MRI. Judge Ebbinger was right to deny summary judgment and to deny qualified immunity with these fact questions. This case should be remanded for a jury trial. Thank you, Ms. Donaldson. Thank you. Mr. Ebbingerson, your rebuttal. May it please the court. No A circuit case clearly establishes that Dr. Baldwin's decision to use a conservative course of treatment to treat a complex knee injury rises to the level not just of negligence, not just of medical malpractice, but of criminal recklessness. Counsel, this case, though, has that additional feature of not just a medical decision about the condition of the knee, but the determination that treatment should wait for a non-medical reason. And our cases, I don't know if you're familiar with the 2004 case of Hartsfield that addresses that question about a non-medical factor playing into a treatment decision. But that seems to be the uniqueness of this case. It's not just a case of someone going to a doctor and a doctor not getting the diagnosis quite right, but the doctor making a determination about future treatment based on a factor unrelated to their medical expertise. Yes, Your Honor. So I'm not familiar with that case specifically. But to answer your question, that situation has to be analyzed within the framework of the Eighth Amendment, which requires a subjective element, but there's also an objective element. There has to be a minimally competent level of care. And so to Your Honor's point, yes, this is a unique case because there was care. In fact, Leonard distinguished the Dad case on the grounds that Dad involved a complete denial of care. And here we don't have a complete denial of care. Conservative treatment was provided by a doctor who believed that it was within the standard of care. So this is a unique case, and it's unique from the Fields case because you have a doctor that's providing care. And the doctor made a decision that the MRI can wait. And I think that the record, too, when you really look at the record and the timeline, it shows that that was Dr. Baldwin's understanding. Yes, Your Honor. And I would venture to guess that Hartfield does not involve undisputed medical testimony that a certain diagnostic test was not imminently necessary, which is the case here. It's an MRI, it's a diagnostic test. Dr. Baldwin repeatedly examined the plaintiff's... But the appellee's position is the doctor said it was needed. Do you dispute that? Is that part of the fact dispute here, that the doctor denies that she said an MRI is needed? I see my time has expired. So the specific quote that Mr. Dantzler alleges is, there's no way your knee is still swelling like that. I think we need to schedule you for an MRI or ortho. Now, importantly, in that quote, there's no specific discussion of when the MRI is needed. Is the MRI needed next month, next week? There's no discussion of how imminent it is. And remember, all that quote from Mr. Dantzler, even taking it under the plaintiff-friendly version, that has to be translated into whether it rises to the level of criminal recklessness not to immediately get an MRI, but instead wait until Mr. Dantzler further follows up and says that he has knee pain. I thank the Court for its time. Thank you, Counsel. The Court thanks both attorneys for your participation and argument before the Court. We'll continue to study the briefing. Your argument's been helpful, and we'll do our best with the issues. Counsel may be excused.